IN THE MATTER OF WILLIAM J. KALLEN, RESPONDENT.

Argued November 22, 1982—Decided February 9, 1983.

*Robert M. Jaworski,* Deputy Attorney General, argued the cause for appellant State of New Jersey, Department of Law and Public Safety, Division of Motor Vehicles (*Irwin I. Kimmelman,* Attorney General of New Jersey, attorney; *Andrea M. Silkowitz,* Deputy Attorney General, of counsel).

*Scott E. Becker* argued the cause for respondent (*Becker & Lands,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

This case raises the important issue of the relationship between state administrative agencies and the Office of Administrative Law ("OAL") in the conduct of contested cases. Specifically, does an administrative law judge have the authority to refuse an Order of Remand from an agency head issued for the purpose of admitting evidence that was not presented at the initial hearing?

The Director of Motor Vehicles, relying on evidence produced on remand before an administrative law judge, suspended for 90 days the driving privileges of respondent, William J. Kallen, for his refusal to submit to a breath chemical test under *N.J.S.A.* 39:4–50.4 (current version at *N.J.S.A.* 39:4–50.4a (1982)). The Appellate Division reversed the Director's Final Decision in an unreported opinion. We granted the State's petition for certification. 89 *N.J.* 449 (1982).

We reverse the judgment of the Appellate Division and reinstate the Final Decision and Order of the Director.

I.

On October 14, 1979, Kallen was arrested by a police officer for driving while under the influence of alcohol in violation of *N.J.S.A.* 39:4–50, and taken to the police station for a breathalyzer test.

At the station, Kallen agreed to take the breathalyzer test. Since the arresting officer was not a certified breathalyzer

operator, the test was administered by another police officer who had such qualifications. After Kallen twice blew insufficient air into the breathalyzer to analyze his blood-alcohol level, the breathalyzer operator advised Kallen that his actions constituted a refusal to take the breath chemical test.

On November 5, 1979, the Director of the Division of Motor Vehicles (the "Director") notified Kallen of a proposed suspension of his license for ninety days under *N.J.S.A.* 39:4–50.4 for his refusal to take the breath chemical test. Kallen filed a timely request for a hearing, which was held before an Administrative Law Judge ("ALJ") on January 22, 1980. The only witnesses to testify at that initial hearing were Kallen and the arresting officer. At its outset, Kallen's attorney stipulated that the arresting officer had reasonable grounds to believe that Kallen was operating his motor vehicle while under the influence of alcohol and that Kallen was in fact arrested. The only contested issue at the initial hearing was whether Kallen had refused to take the breathalyzer test.

On February 7, 1980, the ALJ issued his initial decision, in which he found that the State had failed to establish by a preponderance of evidence that Kallen had refused to take the breathalyzer test. The ALJ noted that the arresting officer was not an expert in the use of the breathalyzer machine, and therefore not qualified to testify on whether the limited amount of air Kallen blew into the device was adequate for testing purposes. He further opined that the State had given no legally sufficient reason for its failure to produce the breathalyzer operator. Since the State had failed to meet its burden of proof, the ALJ recommended that the charges against Kallen be dismissed.

Twenty days later on February 27, 1980, the Police Chief of the initiating municipality requested the Director to reopen the case to permit the testimony of the breathalyzer operator. Kallen objected to a rehearing.

On March 25, 1980, the Deputy Director for the Division,[1] granted the request and remanded the case to the ALJ to reopen the hearing to take the testimony of the breathalyzer operator. In his decision, the Deputy Director stated these reasons for the remand:

> Under the circumstances of this case, I feel that for a full and true disclosure of the facts in this case, this matter should be rescheduled for another hearing at which time the breathalyzer operator ... shall testify ....

The remand hearing was held on May 12, 1980. On June 13, 1980, the ALJ issued his Decision on Remand. He concluded that the remand was fundamentally unfair because the sole purpose of the remand was to present evidence that with reasonable diligence could have been presented at the initial hearing. Accordingly, he claimed the authority to refuse to comply with the Director's Order of Remand and recommended dismissal of the charge.

However, to avoid the necessity of another hearing, the ALJ did allow the breathalyzer operator to testify, and concluded that if the operator's testimony were properly before him, the State had proved that Kallen had refused to take the breath chemical test in violation of *N.J.S.A.* 39:4–50.4.

On July 18, 1980, the Director reversed the ALJ's recommendation, upholding the propriety of the remand and suspending Kallen's driving license for 90 days. Kallen appealed to the Appellate Division, which stayed the suspension of Kallen's driving privileges.

The Appellate Division, in reversing the Director's final decision, relied on the "fundamental fairness" doctrine set forth in *State v. Tropea,* 78 *N.J.* 309 (1978), and a newly-enacted rule of the Office of Administrative Law, *N.J.A.C.* 1:1–16.5(c) to hold that the ALJ had the authority to refuse to comply with the Order of Remand.

---

[1]Under *N.J.S.A.* 39:2–4, the Deputy Director of Motor Vehicles, when deputized by the Director, has all the powers of the Director in the performance of such duties as the Director may assign to him.

## II.

This case concerns the relationship between state administrative agencies and the Office of Administrative Law. Here, the Court must consider whether the ALJ's action in refusing to comply with the Order of Remand from the Deputy Director constitutes an undue interference with the agency head's right to make the final decision in a contested case. In *Unemployed-Employed Council of N.J. v. Horn,* 85 *N.J.* 646 (1981), and *In re Uniform Adm'n Procedure Rules,* 90 *N.J.* 85 (1982), we established principles that are relevant here.

■ An agency head has the exclusive right to decide contested cases in administrative hearings. As we recently wrote:

Because the agency has the statutory jurisdiction to set and enforce regulatory policy, the final decision in contested cases is entrusted solely to the agency head. [*In re Uniform Adm'n,* 90 *N.J.* at 96.]

The Legislature's intent to give agency heads final decision-making power is embodied in at least three statutory provisions. First, *N.J.S.A.* 52:14B–10(c) gives the head of an agency the power to "adopt, reject or modify the recommended report and decision" of an ALJ. Second, *N.J.S.A.* 52:14F–7(a) provides in pertinent part,

a. Nothing in this amendatory and supplementary act shall be construed to deprive the head of any agency of the authority pursuant to section 10 of P.L.1968, c. 410 (C. 52:14B–10) to determine whether a case is contested or to adopt, reject or modify the findings of fact and conclusions of law of any administrative law judge.

Third, *N.J.S.A.* 52:14F–8(b) provides that no ALJ shall hear a contested case in which the agency head has determined to conduct the hearing directly and individually.

■ Administrative agencies are the arms of the executive branch of government that implement the laws passed by the Legislature. *General Assembly of New Jersey v. Byrne,* 90 *N.J.* 376, 386 (1982). Administrative agencies effectuate the programs and policies the Legislature specifically delegates to them. In recognition of the agency's regulatory responsibilities, the Legislature specifically reserved the decisional power in the agency head. The decisional power may be exercised either

through rulemaking or adjudication. Both powers are integrally related. *See Texter v. Human Services Dep't.,* 88 *N.J.* 376, 383–86 (1982); 3 K. Davis, *Administrative Law Treatise* §§ 14:4–6 (2d ed. 1980) (discussing the interrelationship between agency rulemaking and adjudication).

While a contested case deals only with an individual dispute, its resolution necessarily reflects the agency's public policy, for "[i]n effect, an agency engages in *ad hoc* rulemaking every time it decides a contested case . . . . Thus, the agency's decisional authority over contested cases is directly and integrally related to its regulatory function." *In re Uniform Adm'n,* 90 *N.J.* at 93–94. *See generally* Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv.L.Rev. 921 (1965).

This is one reason that the agency head has the exclusive authority to make the final determination in a contested case. Another reason is that the agency head is responsible for the efficient and effective use of public resources in carrying out the agency's responsibilities. In this day of increasing budget restraints at all levels of government, it is essential that this power be scrupulously exercised.

Here, respondent criticizes the Director for not having had two police officers present at the initial hearing. In 1980, the Division sent 1,934 breath refusal cases to the OAL.[2] To avoid the very substantial cost and burden on local police departments and state resources, the Director has determined that in most breath refusal cases, only the arresting officer need testify

---

[2] Figure obtained from the internal records of the Division of Motor Vehicles. For efficiency reasons, Municipal Courts, rather than the Division, are now responsible for revoking the licenses of those who refuse breath tests. *N.J.S.A.* 39:4–50.4a (West Supp.1982–83), repealing *N.J.S.A.* 39:4–50.4. See N.J. Senate Judiciary Committee Statement to Assembly No. 2293, *L.* 1981, *c.* 512.

initially and no attorney for the state need be present.[3] Kallen's case is unrepresentative of most breath test refusal cases because of the sophisticated form of his "refusal," *i.e.,* his failure to blow *enough* air into the device. Had he simply declined to step up to the machine at all, no expert testimony would have been necessary.

An ALJ is limited to the facts in a particular case. Here, the ALJ did not have the information to determine the most efficient allocation of the Division's resources. Nor was it his function. Rather, it was the Director, knowing the number of pending breath refusal cases and the limited public resources available, who had the necessary information to allocate governmental resources in the prosecution of this case.

What role, then, does an ALJ have in a contested case? Prior to the establishment of the OAL in 1979, most hearings were conducted by hearing examiners who were usually agency employees with diverse duties in addition to their hearing responsibilities. Frequently, therefore, a hearing examiner presided over a case in which his own employer agency was an interested party. Committee Statement to N.J. Senate Bill No. 766, *L.* 1978, *c.* 67 ("Committee Statement"). It was widely perceived that the use of agency employees as hearing officers encouraged a bias in favor of the agency and undermined the fairness and impartiality desired in an administrative hearing. *Horn,* 85 *N.J.* at 650.

In response to this problem, the Legislature established the OAL. The major change effected was to replace agency hearing officers with a new group of independent hearing officers, *i.e.,* "administrative law judges." The ALJs now perform essentially the same functions that hearing examiners formerly performed in contested cases. They conduct the hearings, make

---

[3]In breath test refusal cases, the Director acts as a "judge"; it is the local police departments who are the prosecutors and the witnesses. Division clerical personnel review the police reports only to make a list of the appropriate witnesses.

recommended factual findings, and recommend decisions to the agency heads. *See N.J.S.A.* 52:14B–10. *See also* Committee Statement, *supra; In re Uniform Adm'n,* 90 *N.J.* at 91; *Horn,* 85 *N.J.* at 650.

As this Court ruled in *In re Uniform Adm'n:*

> In creating an independent Office of Administrative Law, the Legislature intended no alteration of the regulatory authority or basic decisional powers of administrative agencies.... Administrative law judges have no independent decisional authority. Any attempt to exercise such authority would constitute a serious encroachment upon an agency's ability to discharge its regulatory responsibility.
>
> [90 *N.J.* at 94.]

In this case, if the ALJ's attempt to resist the remand were upheld, the record submitted to the Director would lack the expert breathalyzer testimony necessary to proving the State's case. The Director would have been compelled, on the basis of an incomplete record, not to suspend the driving license of an individual who had actually refused to submit to the breath chemical test. Thus, the ALJ's unilateral act would have effectively predetermined, if not preempted, the Director's final decision, thereby seriously impinging upon the regulatory prerogatives of the agency. Under the prevailing law in *Horn* and *In re Uniform Adm'n,* the Director here, not the ALJ, had the final decisional authority. Hence, the ALJ had no authority to refuse to obey the Director's Order of Remand.

### III.

The ALJ and the Appellate Division rejected the contention that this case is controlled by *Horn* and its progeny. They concluded that the case is controlled by "fundamental fairness" principles set forth in *State v. Tropea,* 78 *N.J.* 309 (1978), and by the newly-enacted rule of the Uniform Administrative Procedure Rules of Practice, *N.J.A.C.* 1:1–16.5(c). We disagree.

This case is easily distinguishable from *Tropea.* A main issue in *Tropea* was whether a case should be remanded to admit further evidence after a final decision had been entered in a

court and appealed.[4] Here, the issue is whether a hearing should be reopened to admit further evidence prior to the entry of a final decision by the head of an administrative agency. Thus, this case is different from *Tropea* in significant respects. It does not concern a final decision entered by a court, but merely the continuation of a hearing by an administrative agency.

With respect to the first difference—the finality of the decision—courts long have had the power to reopen the record to admit additional evidence prior to the entry of a final judgment.[5] Since administrative agencies have the inherent authority to reopen, modify, or rehear even final orders, *a fortiori,* they like courts, possess the right to reopen or continue hearings prior to the entry of a final order.[6] *See, e.g., In re Trantino Parole Application,* 89 *N.J.* 347 (1982); *Duvin v. State,* 76 *N.J.* 203, 207 (1978); *Skulski v. Nolan,* 68 *N.J.* 179 (1975); *Ruvoldt v. Nolan,* 63 *N.J.* 171 (1973); *Burlington County Evergreen Park Mental Hosp. v. Cooper,* 56 *N.J.* 579 (1970); *Handlon v. Town of Belleville,* 4 *N.J.* 99 (1950). *See also Farley v. Ocean Tp. Bd. of Educ.,* 174 *N.J.Super.* 449, 453 (App.Div.), certif. den., 85 *N.J.* 140 (1980).

With respect to the second difference—the difference between administrative forums and courts—we have held that administrative agencies "are not judicial tribunals." *In re Uniform Adm'n,* 90 *N.J.* at 92. Because administrative agencies need flexibility in exercising their executive role through rulemaking

---

[4]In *Tropea,* the original court no longer had nor could it reacquire jurisdiction of the case.

[5]*See, e.g., R.* 1:7–4 (permitting the judge in a civil nonjury trial to reopen a case after final judgment is entered to add to or amend the findings of fact).

[6]Since the ALJ's initial decision was not a final decision, Kallen's claims of double jeopardy and res judicata are inapplicable. *In re Trantino Parole Application,* 89 *N.J.* 347, 364 (1982) (the reconsideration of an agency decision involving the same parties does not implicate the doctrine of res judicata). *See also Restatement, Judgments* 2d, § 13 (1980).

and adjudication, "[a]n agency, even in its adjudicatory role, 'is not a neutral forum whose sole function is to decide the controversy presented to it.'" *Id.* The agency also must effectuate its established public policy:

> The power exercised by administrative agencies, having legislative and executive as well as judicial characteristics, has been termed "quasi-judicial" when it takes the form of adjudication in contested cases.
>
> * * * * * * * *
>
> Consequently, procedures and techniques developed to handle the operation and business of the courts may not be transported *in toto* or imported wholesale into administrative agencies.
>
> [*City of Hackensack v. Winner,* 82 *N.J.* 1, 28–29 (1978).]

Similarly, in *In re Uniform Adm'n,* we recently held that because an agency head's powers of review in an administrative hearing relate to his regulatory authority, they are more expansive and flexible than those of an appellate judge in reviewing issues on an interlocutory basis. 90 *N.J.* at 90. *See also Kelly v. Sterr,* 62 *N.J.* 105, *cert.* denied, 414 *U.S.* 822, 94 *S.Ct.* 122, 38 *L.Ed.*2d 55 (1973); *Mechanics Nat'l Bank v. Brady,* 121 *N.J.Super.* 62 (App.Div.), aff'd o.b., 61 *N.J.* 514 (1972); *David v. Strelecki,* 51 *N.J.* 563, *cert.* denied, 393 *U.S.* 933, 89 *S.Ct.* 291, 21 *L.Ed.*2d 269 (1968).

The Legislature's intent not to impose the procedural requirements of courts of law on hearings before administrative agencies is evidenced in *N.J.S.A.* 52:14B–10, which provides for the liberal admission of evidence in a contested case, and *N.J.S.A.* 52:14B–12, which liberalizes the agency's internal process of administrative review.

 However, the discretion of an agency head in hearing a contested case is not unlimited. Administrative hearings in contested cases must "operate fairly and conform with due process principles." *Laba v. Newark Bd. of Educ.,* 23 *N.J.* 364, 382 (1957). While the manner of conducting a hearing may vary, "[a]s long as principles of basic fairness are observed and adequate procedural protections afforded, the requirements of administrative due process have been met." *Kelly v. Sterr,* 62

*N.J.* at 107. Although it is clear that a driver appearing before the Director of Motor Vehicles in a suspension .or revocation proceeding is entitled to those "incidents of fairness which underlie procedural due process," *Bechler v. Parsekian,* 36 *N.J.* 242, 256 (1961), it is equally clear that the special rules which attach to criminal proceedings do not extend to administrative hearings of this nature. *David v. Strelecki,* 51 *N.J.* at 566.

Administrative hearings in contested cases may conform to procedural due process standards that are less restrictive than those imposed in court proceedings. Kallen does not contend that he did not receive constitutional procedural due process in this case. The issue is whether he received a hearing conforming to principles of fundamental fairness. The determination of whether principles of basic fairness have been afforded in contested administrative cases requires an examination of the facts in each case, giving great weight to the effect of the decision on the agency's public policy.

In *Monks v. State Parole Bd.,* 58 *N.J.* 238, 249 (1971), the Court held that "fairness and rightness clearly dictate the granting of the prisoner's request for a statement of reasons [of why parole was denied]" from the State Parole Board. We specifically noted that such a requirement would not impinge upon the Board's discretion and expertise in parole matters, nor would it create an undue administrative burden. *Id.*

In *In re Arndt,* 67 *N.J.* 432 (1975), the Director waited 20 months after a driver refused to take a breathalyzer test to notify him of the proposed suspension of his license and nearly 10 months after the hearing to render a final decision. We vacated the order of suspension, holding that such long delays violated the principles of fundamental fairness imposed on administrative agencies. 67 *N.J.* at 436–37. As a further reason for its decision, this Court opined that the Director's action frustrated public policy, namely, the prompt removal of offending drivers from the road. *Id.* at 435–36.

However, in *In re Garber*, 141 *N.J.Super.* 87, certif. den. 71 *N.J.* 494 (1976), the Appellate Division distinguished *Arndt* and ruled that the Director's delay of approximately 12 months in rendering his decision did not violate the principles of fundamental procedural fairness. It stated:

> Delay will not generally affect the validity of an administrative determination, particularly where no prejudice is shown. [141 *N.J.Super.* at 91.]

A comparison of *Arndt* and *Garber* discloses that there are no simple answers as to what constitutes fundamental fairness in administrative hearings. Each case must be considered and evaluated on its own merits. Whether an individual has received a hearing that is fundamentally fair depends upon consideration of a number of factors. This Court, in determining whether administrative agencies have the inherent authority to reopen, to modify, or to rehear final orders previously entered, has generally considered (1) the burden on the individual the reopening would impose, (2) the reason for the reopening, and (3) the public interest served by the reopening. *See Skulski v. Nolan*, 68 *N.J.* at 195–201; *Ruvoldt v. Nolan*, 63 *N.J.* at 183–84; *Burlington County Evergreen Pk. Mental Hosp. v. Cooper*, 56 *N.J.* at 600; *Handlon v. Town of Belleville*, 4 *N.J.* at 106–07.

## IV.

We conclude that Kallen received an administrative hearing which conformed with the principles of fundamental fairness imposed on administrative agencies.

The private burden on Kallen occasioned by the remand was minimal, at best. Kallen had ample and timely notice of the continuance. He did not lose his license pending the second hearing. The delay between the two hearings was less than four months, far short of the delay in *Arndt*. Kallen was represented by counsel at the hearing and had the opportunity to cross-examine the testifying officer. The only "unfairness" he alleges is the burden of appearing at the continued hearing with his attorney. This inconvenience hardly constitutes an egregious deprivation.

The second factor—the reason for the rehearing—weighs heavily in favor of the agency here. If anything, the remand for additional testimony *reduced* the risk of capricious error in this case. No procedural alternative existed short of forcing the Director to render a decision without the breathalyzer expert's testimony.

By disallowing the testimony, the ALJ precluded the Director from fulfilling his responsibility to the public to decide a case on the best available record. Both the ALJ and the Director knew that evidence essential to a proper and fair disposition of the case was lacking. If the ALJ's refusal remained undistributed, the Director would have been forced to render a final decision on an incomplete record. It makes no sense for an administrative agency "to create an injustice, instead of remedying one, by omitting to inform itself and by acting ignorantly when intelligent action is possible." *Isbrandsten Co., Inc. v. United States,* 96 *F.Supp.* 883, 892 (S.D.N.Y.1951), *aff'd,* 342 *U.S.* 950, 72 *S.Ct.* 623, 96 *L.Ed.* 706 (1952).

Third, the public policies furthered by the remand must be compared to Kallen's private inconvenience. Here, the public policy is clear. There are few types of administrative proceedings in which the public has a stronger interest than the immediate removal of drunk drivers from the highways. One of the major concerns of both the executive and legislative branches of government today is discouraging intoxicated drivers behind the wheel.[7] Nearly 600 people die each year in New Jersey in auto accidents that are alcohol-related.[8]

---

[7]On the legislative front, a host of bills were introduced last session in both the State Senate and Assembly to strengthen the legal deterrents against drunk driving. *See, e.g., S.* 1810, 200th Leg., 1st Sess. (defining the consumption of an alcoholic beverage while driving as unlawful careless driving *per se*); *S.* 1860, 200th Leg., 1st Sess. (prohibiting the mere consumption of alcoholic beverages while driving); *S.* 1861, 200th Leg., 1st Sess. (imposing a mandatory 48-hour jail sentence for a second drunk driving violation); *S.* 1885, 200th Legis., 1st Sess. (identifying aggravating circumstances that

As part of the public policy to enforce the drunk driving laws of the State, the Legislature enacted the Implied Consent Law, *N.J.S.A.* 39:4–50.4. The statute provides that an individual who refuses to take a breath chemical test shall have his or her license suspended. The statutory purpose of this law is not to punish the driver but to protect the motoring public by removing the offending driver from the highways with reasonable dispatch. *Atkinson v. Parsekian,* 37 *N.J.* 143, 155 (1962). *Accord In re Arndt,* 67 *N.J.* at 435; *David v. Strelecki,* 51 *N.J.* at 566.

If the ALJ's action is upheld, the Director would not be able to suspend the driver's license of one who had refused to submit to a breath chemical test—a clear violation of the Legislature's policy to protect the public embodied in *N.J.S.A.* 39:4–50.4. The balance of factors clearly supports the fairness of the remand in this case and establishes that the hearing was conducted in conformity with the fundamental fairness principles imposed on administrative agencies.

---

would trigger higher minimum penalties for drunk driving offenses); *S.* 2020, 200th Legis., 1st Sess. (creating a Drunk Driving Enforcement Fund to finance additional law enforcement of drunk driving statutes); *A.* 1380, 200th Legis., 1st Sess. (prescribing a fixed minimum 120-day jail term for drunk drivers convicted in death by auto cases); *A.* 2022, 200th Legis., 1st Sess. (proscribing the consumption of alcoholic beverages by vehicle operators or passengers); *A.* 2036, 200th Legis., 1st Sess. (proscribing alcoholic beverage consumption while driving); *A.* 2051, 200th Legis., 1st Sess. (similar to *A.* 2036, but with different penalty provisions); *A.* 2262, 200th Legis., 1st Sess. (companion bill to *S.* 2020). Legislation was recently enacted to raise the state drinking age to 21, in part in response to data indicating that the pre-existing lower age was producing greater highway deaths. *L.*1982, *c.* 215 (signed December 28, 1982). The executive branch has been similarly active, most notably with the establishment of a toll-free "drunk driver hotline" that permits persons spotting drunken motorists to notify the State Police immediately. Further, Governor Kean identified drunk driving as a primary target of governmental initiatives in his 1983 Message to the Legislature. *Annual Message to the New Jersey State Legislature by Thomas H. Kean, Governor* at 8 (January 11, 1983).

8Figure obtained from internal statistics of the Office of Highway Safety, Division of Motor Vehicles.

## V.

■ The ALJ and the Appellate Division also concluded that the remand violated fundamental fairness, in that the Director did not exercise reasonable diligence in failing to present the expert's evidence at the initial hearing. They rely on the newly-enacted Uniform Administrative Procedure Rule of Practice, 1:1–16.5(c), which provides:

> An agency head may enter an order remanding a contested case to the Office of Administrative Law for further action on issues or arguments not previously raised or incompletely considered. The order or remand shall specifically state the issues or arguments to be considered, their scope and their relationship to the issues and arguments already considered. *Where the agency is a party to the case, however, the agency head may not remand to develop proof that, in the exercise of reasonable diligence, could have been presented by the agency at the original hearing* (emphasis added).

This rule became effective July 1, 1980, after the ALJ's decision on remand, but before the Director's final decision. The rule is not at issue here, and we therefore do not pass on its validity. However, its application here would be unenforceable since it would have resulted in the nullification of the Director's right to make the final decision in a contested case and would have had untoward substantive effects. We therefore urge the OAL to review the rule. Further, if the rule did properly apply, we cannot conclude, considering the volume of breath refusal cases, the limited public resources available, the peculiar form of Kallen's "refusal," and the strong enforcement policies to be effected, that the Director did not use reasonable diligence in having only one police officer testify at the initial hearing.

## VI.

In conclusion, we reaffirm that an agency head has the sole power to make the final decision in contested cases and that an ALJ does not have the authority to refuse to comply with an order of remand of an agency head. Here, by resisting the breathalyzer operator's testimony, the ALJ predetermined the outcome of the case, clearly nullifying the Director's right to make the final decision. In doing so, he frustrated the strong

public policy of this State of removing from our highways drivers who refuse to take the breath chemical test.

Further, we conclude that the Director did not violate fundamental fairness standards applicable to administrative hearings. In determining whether fundamental fairness standards in an administrative hearing are met, we must compare the burdens on the individual with the public's benefit from imposing that burden. "The utilization of court-made procedural tools in administrative proceedings must depend in the final analysis upon the nature of the agency's regulatory responsibilities toward the subject matter of the controversy ... the public interest is an added dimension in every administrative proceeding." *City of Hackensack,* 82 *N.J.* at 30. While there may be a case where remand entails such an egregious deprivation that it denies an individual a fundamentally fair hearing, such clearly is not the case here. Here, the burden on the individual is minimal, in contrast with the strong public interest the Director is serving.

Accordingly, we reverse the judgment of the Appellate Division and reinstate the Director's Final Decision and Order.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, POLLOCK, O'HERN and GARIBALDI—7.

*For affirmance*—None.